# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ABIGAIL MULLEN,<br><br>　　Plaintiff,<br><br>v.<br><br>MSA SAFETY INCORPORATED,<br><br>　　Defendant. | Case No. 2:20-cv-2020<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT

NOW COMES Plaintiff, Abigail Mullen, by and through her attorney, David Manes, Esq., of Manes & Narahari, LLC, and files this Amended Complaint alleging as follows:

### I. Nature of the Action

1. Plaintiff brings this Complaint to recover damages under the Americans with Disabilities Act of 1990 ("ADA"), "), 42 U.S.C. § 12101 *et seq.,* the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq*. Plaintiff alleges that Defendant failed to accommodate her disability and discriminated against her based on her use of federally-protected leave under the FMLA.

### II. Jurisdiction and Venue

2. This action arises under the ADA and FMLA. This Court has jurisdiction over Plaintiff's discrimination claims pursuant to 28 U.S.C. § 1331.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4. Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391(b).

5. Plaintiff filed a timely charge with the Equal Employment Opportunity Employment Commission ("EEOC") regarding her allegations under Title VII on August 10, 2020, under charge number 533-2019-020885. *See Exhibit 1*.

6. Plaintiff was mailed Notice of Right to Sue from the ("EEOC") on November 24, 2020. This Complaint has been filed within ninety (90) days of the Plaintiffs receipt, thus making this action timely. *See Exhibit 2*.

### III. Parties

7. Plaintiff, Abigail Mullen ("Mullen"), is an adult individual with a primary residence located at 7642 Big Beaver Boulevard, Wampum, PA 16157.

8. Defendant, MSA Safety Incorporated ("MSA Safety, Inc."), is a Pennsylvania business corporation with a regular place of business located at 1000 Cranberry Woods Drive, Cranberry Township, PA 16066.

### IV. Facts

9. Mullen began working for MSA Safety, Inc. on March 23, 2015 as a Production Technician. Her job duties included soldering, testing, manufacturing, engaging in team work activities, training, computer input, and running calibration ovens.

10. Mullen was a dutiful employee who excelled in her position.

11. During the course of her employment, Mullen notified members of management at MSA Safety, Inc. of her documented disabilities, including an anxiety disorder, panic disorder,

and Sphincter of Oddi dysfunction, which is a condition that results in severe and regular abdomen pain.

12. These disabilities did not hinder Mullen's ability to perform the essential functions of her job with reasonable accommodation from MSA Safety, Inc.

13. However, in August 2019, Mullen began to experience instances of bullying and harassment from her co-workers on the production line.

14. MSA Safety, Inc. employee Abigail Jolly ("Jolly"), a member of the production line, started to harass Mullen. The harassment was based on Jolly's romantic relationship with Tyler Smith ("Smith"), a fellow employee who also worked on the production line.

15. At one point, Smith told Mullen that Jolly did not like when Mullen engaged in conversation with him. Smith explained that Jolly would get mad at him when he and Mullen would talk too much.

16. On August 20, 2019, Mullen disclosed the harassing behavior perpetrated by Jolly to Margie Woods ("Woods"), a member of the Human Resources Department at MSA Safety, Inc. Woods suggested the women engage in a mediation to sort out the problems that they faced.

17. The next day, August 21, 2019, Woods initiated a mediation with Mullen, Jolly, and Bernie Goia ("Goia"), who served as Mullen's supervisor.

18. At the start of the meeting, Woods instructed all parties that they were prohibited from name-calling and yelling during the mediation. Despite this, at one point, Jolly told Mullen that she was "delusional."

19. Neither Woods nor Goia corrected Jolly for insulting Mullen.

20. At one point during the mediation, Woods stated: "I refuse to investigate this." This was in reference to Mullen's complaints of bullying and harassment.

21. Woods further stated that the issues between Jolly and Mullen were outside of the workplace and were thus outside of the control of MSA Safety, Inc. This was inaccurate, as Mullen regularly experienced bullying and harassment from Jolly *while* at work. Mullen had no contact with Jolly outside of work.

22. Although MSA Safety, Inc. touts a zero-tolerance policy for bullying, Woods and Goia ignored the policy and refused to assist Mullen.

23. On August 22, 2019, Mullen contacted MSA Safety, Inc's Production Manager, Shane Livingston ("Livingston"), and sought guidance regarding the results of the mediation. Mullen wanted to discuss the matter in private, but Livingston approached her in front of her co-workers to discuss the matter. Jolly was in the area during the conversation.

24. Livingston instructed Mullen to ignore the problems that she faced with Jolly. He also stated that, if she continued to ask for the situation to be resolved or if she went to upper-level management with her concerns, her job would be in jeopardy.

25. This is the second time the MSA Safety, Inc's zero-tolerance policy was ignored.

26. The bullying and harassing continued. For example, on two occasions, Jolly and MSA Safety, Inc. employee RJ Suthers ("Suthers") hit into Mullen while they were all working on the production line. Neither apologized to Mullen, and she believe that the acts were intentional.

27. On another occasion, a card was passed around the department for an employee's birthday. Everyone other than Mullen was asked to sign the card.

28. Mullen discussed her concerns with Shawn McClean ("McClean"), her group leader. She informed him that it upset her that Jolly and Suthers acted as if she did not exist. Mullen later found out that McClean repeated all of her complaints directly to Jolly and Suthers.

29. Mullen also reported her concerns to her manager, Goia. He informed Mullen that her problem with the bullying was not a work-place issue, despite the fact that the instances of harassment all occurred at work during regular business hours.

30. In the early part of 2020, Mullen began to notice that several of her co-workers began mocking and laughing at her disability. Several employees started to refer to her as "crazy."

31. Mullen requested that she be provided a new position so that she could work away from those who were perpetrating the harassment. MSA Safety, Inc. denied this request for accommodation.

32. The harassment that she faced and MSA Safety, Inc's refusal to remedy the situation caused great stress of Mullen. As a result, she decided that she needed to take time off intermediately through the FMLA in order to address the significant stress that she faced.

33. However, an issue arose with MSA Safety, Inc's third-party FMLA provider, UNUM. Mullen's available days were thus not properly recorded. Based on this miscommunication, Woods and Goia attempted to terminate Mullen's employment.

34. In response to accusations that Mullen improperly filed for time off, she provided evidence through the UNUM cell phone app to show that she had requested off using the proper protocol.

35. Despite this proof, MSA Safety, Inc. suspended Mullen for three days and issued her a write-up.

36. On February 5, 2020, while at work, Mullen began writing an email regarding the harassment which she continued to experience. Employee Brendan Cujas ("Cujas") approached Mullen from behind and began to read the email over her shoulder.

37. Cujas proceeded to tell several other employees about the email. Later, McClean, who had heard about Mullen's email, attempted to pressure her into disclosing all of the email's content to him.

38. Co-worker Kimberly Pfeffer told Mullen that McClean was attempting to scare her into telling him about the email.

39. Approximately one week later, Mullen met with Michelle Monroe ("Monroe"), a member of MSA Safety, Inc's Human Resources Department. During this meeting, Mullen told Monroe about the various harassment that she faced. Mullen further explained that she had been using more FMLA time as a result of the stress of the hostile work environment.

40. Monroe told Mullen that she would have an HR representative from a different location of MSA Safety, Inc. to investigate her claims.

41. In the end, Monroe conducted the investigation herself, and she concluded that the staff was being "childish and petty." This did not rise to the level of harassment, according to Monroe. She downplayed the seriousness of Mullen's claims.

42. In March 2020, Mullen had clocked in three minutes late to a shift one day. Panicking about this, she went directly to HR and spoke with Ashley Hohman ("Hohman") about it.

43. Hohman informed Mullen that this would count as half an occurrence and that she would be terminated due to the two-year probationary period that she was placed of as a result of the incorrect write up that she received at the beginning of the year.

44. After speaking to a different coworker, Mullen learned that other members of MSA Safety, Inc's staff had been calling off to use vacation time and not having any occurrences placed on their record.

45. Mullen went back to HR to speak with Hohman about this.

46. Hohman responded by stating: "Oh yeah, I forgot about that." She then allowed Mullen to take a vacation day instead of having a half of occurrence.

47. On June 15, 2020, Mullen received a letter from UNUM which stated, that, as of that stated she had "used 10 weeks, 25 hours, and 4 minutes of FMLA. You will have 1 week, 14 hours, and 56 minutes of FMLA remaining."

48. This led Mullen to believe that she had time left to use under FMLA.

49. On June 18, 2020, Mullen spoke to UNUM regarding the discrepancy in her FMLA hours. The representative that she spoke with verified that she had enough hours to cover four days off in June.

50. Then, on July 7, 2020, Hohman and the on-site nurse told Mullen that the same four FMLA days had been denied. Mullen explained that she spoke directly to UNUM and was approved to take the time off. Mullen was then informed that she had no remaining leave available through FMLA.

51. Mullen was terminated on July 17, 2020 for the four days in June which she took off.

52. Hohman informed Mullen that she would have her job back if she could supply proof that UNUM provided her with incorrect information. However, the company refused to provide Mullen with evidence of her recorded call.

53. On July 20, 2020 Josh Wing, a representative from UNUM reviewed the phone call and stated that there was a discrepancy between the information that the original representative provided and the actual FMLA that Mullen had at the time.

54. The next day, July 21, 2020, Mullen filed a complaint with MSA Safety, Inc's ethics hotline regarding the hostile work environment and the lack of correction of the FMLA error.

55. Mullen then spoke with benefits administrator, Erin Bernhardt ("Bernhardt"). She was informed that UNUM had not given her false information. Bernhardt stated that Mullen had to speak directly to UNUM.

56. UNUM then stopped taking Mullen's calls, as she was no longer an employee of MSA Safety, Inc.

57. Had the bullying and harassment been addressed properly, Mullen wouldn't have used as much FMLA time and would not have gone over, regardless of the miscommunication between UNUM and MSA Safety, Inc.

## COUNT I
## Disability Discrimination in Violation of the ADA

58. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

59. The protections offered through the ADA are well settled law which prevent employers from discriminating against individuals with disabilities.

60. The inquiry into whether a person is disabled under the ADA is made by a case-by- case analysis. Tice v. Centre Area Transport Authority, 247 F.3d 506 (3rd Cir. 2001).

61. In order to establish a *prima facie* case of discrimination under the ADA, a plaintiff must show:

    a. She is a disabled person within the meaning of the ADA;

    b. She "is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer;" and

      c. She "suffered an otherwise adverse employment decision as a result of discrimination." Stultz v. Reese Bros., Inc., 835 A.2d 754, 760 (Pa. Super. 2003).

62. Here, Mullen was disabled under the ADA as a result of her diagnoses of an anxiety disorder, panic disorder, and Sphincter of Oddi dysfunction.

63. She was qualified for her job, and was an efficient employee for several years.

64. Mullen suffered adverse employment decisions when MSA Safety, Inc. failed to assist her claims of discrimination.

65. Additionally, Mullen experienced adverse action as a result of her termination despite the fact that she was provided inaccurate information regarding her available FMLA time.

WHEREFORE, Plaintiff hereby respectfully requests that this Court enter judgement in her favor, and against the Defendant, and award all damages available at law in equity, including: lost wages, front pay, compensatory damages, punitive damages, court costs, attorney fees, prejudgment and continuing interest, and any other relief that the Court deems necessary and proper.

## COUNT III
### Failure to Accommodate in Violation of the ADA

66. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

67. To state a *prima facie* case for failure to accommodate under the ADA, a plaintiff must show:

      a. She was disabled within the meaning of the ADA and the employer was aware of her disability;

      b. She made a request for a reasonable accommodation;

    c. Her employer failed to make the reasonable accommodation on a good faith basis; and

    d. The accommodation was reasonable and could have reasonably have been achieved. <u>Dreibelbis v. County of Berks</u>, 438 F. Supp. 3d 304, 316 (E.D. Pa. 2020).

68. Here, Mullen was disabled under the ADA as a result of her diagnoses of an anxiety disorder, panic disorder, and Sphincter of Oddi dysfunction.

69. She made a reasonable request for accommodation in that she asked to be offered a different position in order to avoid the harassment of her co-workers. MSA Safety, Inc's refusal to move Mullen to a different department exacerbated her medical conditions and caused her increased stress and anxiety.

70. Such accommodation was reasonably available to Mullen; MSA Safety, Inc. simply refused to accommodate her.

71. Mullen's requests were reasonable, especially considering the pervasiveness of the harassment which she faced by her co-workers.

WHEREFORE, Plaintiff hereby respectfully requests that this Court enter judgement in her favor, and against the Defendant, and award all damages available at law in equity, including: lost wages, front pay, compensatory damages, punitive damages, court costs, attorney fees, prejudgment and continuing interest, and any other relief that the Court deems necessary and proper.

## COUNT V
**Discrimination in Violation of the FMLA**

72. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

73. In order to prevail on a claim of retaliation under the FMLA, a plaintiff must show that:

   a. She invoked her right to FMLA-qualifying leave;

   b. She suffered an adverse employment decision; and

   c. The adverse action was causally related to his invocation of rights. <u>Lichtenstein v. U. of Pittsburgh Med. Ctr.,</u> 691 F.3d 294, 302 (3d Cir. 2012).

74. The two main factors relevant with respect to establishing a causal link to satisfy the *prima facie* case of retaliation under the FMLA are: (1) timing and/or (2) evidence of ongoing antagonism. <u>Sabbrese v. Lower's home Center's Inc.,</u> 320 F. Supp. 2d 311 (W.D. Pa. 2004).

75. Here, Mullen invoked her right to FMLA-qualifying leave.

76. She received incorrect information from the third-party FMLA service, which resulted in her use of unapproved days. MSA Safety, Inc. refused to acknowledge this error and terminated Mullen.

77. MSA Safety, Inc. took adverse employment action against Mullen as a result of her use of FMLA leave in that it failed to recognize the error made by UNUM.

WHEREFORE, Plaintiff hereby respectfully requests that this Court enter judgement in her favor, and against the Defendant, and award all damages available at law in equity, including: lost wages, front pay, compensatory damages, punitive damages, court costs, attorney fees, prejudgment and continuing interest, and any other relief that the Court deems necessary and proper.

Respectfully Submitted,

/s/ David Manes
PA ID: 314661
**MANES & NARAHARI, LLC**
429 Fourth Avenue, Ste 300
Pittsburgh, PA 15219
(412) 626-5570 Direct
(412) 650-4845 Fax
dm@manesnarahari.com

## VERIFICATION

    I, Abigail Mullen, swear under penalty of perjury under the laws of the United States of America that the facts alleged in the foregoing Amended Complaint are true and correct to the best of my knowledge.

_____
Abigail Mullen